Julie Pettit
State Bar No. 24065971
THE PETTIT LAW FIRM
2101 Cedar Springs, Suite 1540
Dallas, Texas 75201
Tel. (214) 329-0151
Fax. (214) 329-4076
jpettit@pettitfirm.com
**ATTORNEYS FOR RETICULUM**
**MANAGEMENT, LLC**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **In re:** | § § § § § § § | |
| **JACOB F. WATTERS,** | | **Case No. 20-30553-bjh7** |
| Debtor. | | **Chapter 7** |
| **RETICULUM MANAGEMENT, LLC,** | § § § § § § § § § § | |
| Plaintiff, | | |
| vs. | | **Adversary No. 20-_____** |
| **JACOB F. WATTERS,** | | |
| Defendant. | | |

## ORIGINAL COMPLAINT OBJECTING TO DISCHARGEABILITY OF A DEBT
## UNDER 11 U.S.C. § 523

Reticulum Management, LLC ("Reticulum" or the "Plaintiff"), files this *Original Complaint Objecting to Dischargeability of a Debt Under 11 U.S.C. § 523* (this "Complaint") against Jacob F. Watters (the "Debtor" or "Watters"), the debtor in the above-captioned bankruptcy case (the "Bankruptcy Case") and the defendant in the above-captioned adversary proceeding (the "Adversary Proceeding"). Plaintiff respectfully states as follows:

---

**ORIGINAL COMPLAINT** **Page 1 of 18**

## I.     INTRODUCTION

1.      The *sole* purpose of the Debtor's bankruptcy is to avoid responsibility for the deceptive misrepresentations he made to Reticulum that induced a $500,000 loan, and for which he was subsequently found by a panel of three arbitrators to be personally liable.

2.      It was only on the morning of a hearing in Texas state court concerning Watters' post-arbitration discovery responses that Watters filed his petition in the above-captioned Bankruptcy Case. At this point, rather than subject himself to any further order of the court, thereby accepting responsibility for his actions and paying what he owes, Watters chose instead to initiate the present Bankruptcy Case.

3.      The Debtor's poverty, inability to pay his debts, and need for this Court's equitable intervention in his financial affairs are inventions the Debtor created to avoid, yet again, repayment of a loan to Plaintiff entered into years ago because of the Debtor's fraud and dishonesty.

4.      The Debtor lives in a spacious, four-bedroom home in Preston Hollow, and he supports himself through his part-time work with CCA Partners, LLC, an entity through which he consults regarding investment opportunities and broker debt opportunities.

5.      Ultimately, the Debtor's attempted discharge of the debt he owes Plaintiff is improper and an abuse of a system intended to provide relief to overwhelmed persons who cannot pay their debts, and not individuals, like the Debtor here, who decide that they do not want to pay their debts. For these reasons and those alleged below, Plaintiff hereby brings this adversary proceeding objecting to the discharge of the debt the Debtor owes to Plaintiff.

## II.     JURISDICTION, VENUE, AND STATUTORY PREDICATE

6.      This Court has subject matter jurisdiction over the Bankruptcy Case and this Adversary Proceeding pursuant to 28 U.S.C. §§ 157 and 1334. "[D]eterminations as to the

dischargeability of particular debts" and "objections to discharges" are core proceedings. 28 U.S.C. § 157(b)(2)(I)-(J).

7. Venue of the Adversary Proceeding in this District is proper under 28 U.S.C. § 1409.

8. This matter arises under the laws of the United States of America. The statutory predicate for the relief sought herein is pursuant to 11 U.S.C. § 523.

9. Reticulum hereby consents to the Court's entry of a final judgment resolving this Adversary Proceeding.

### III. PARTIES

10. Reticulum is a Texas limited liability company, with its principal place of business located at 9190 Cypress Waters Blvd., Apt. 106, Coppell, Texas, 75019, and may be served with pleadings and process in this Adversary Proceeding through undersigned counsel.

11. The Debtor is an individual who resides at 10559 Countess Drive, Dallas, Texas 75229.

### IV. PROCEDURAL BACKGROUND

12. On February 19, 2020 (the "Petition Date"), the Debtor filed his voluntary petition under chapter 7 of title 11 of the United States Code, 11 U.S.C. § 101 *et seq*. (the "Bankruptcy Code"), in this District, initiating the above-captioned Bankruptcy Case. Jeffrey H. Mims (the "Chapter 7 Trustee") was subsequently appointed as chapter 7 trustee.

13. On March 25, 2020, the Debtor filed his Schedules (the "Schedules") and Statement of Financial Affairs ("SOFA") in the Bankruptcy Case. *See* Docket No. 24. The Debtor subsequently amended only his Schedule A/B on April 13, 2020. *See* Docket No. 32.

---

14. On February 19, 2020, the first meeting of creditors pursuant to section 341 of the Bankruptcy Code (the "341 Meeting") was set to be held on April 7, 2020, and the deadline to oppose discharge or dischargeability was set for June 8, 2020. *See* Docket No. 7.

15. On April 14, 2020, the 341 Meeting was ultimately reset for May 4, 2020, and the deadline to oppose discharge or dischargeability was reset for July 6, 2020. *See* Docket No. 35.

16. On May 12, 2020, the Chapter 7 Trustee concluded the 341 Meeting.

## V. RELEVANT FACTUAL BACKGROUND

**A. Jacob Watters's educational and professional background.**

17. The Debtor is a sophisticated investor, is formally educated, and has approximately fifteen years of private equity experience.

18. In 2000, the Debtor graduated from Bradley University with a bachelor's degree in finance, and the Debtor later earned a Masters of Business Administration from the SMU Cox School of Business.

19. Around 2005, the Debtor went to work for Covalent Capital, a private equity firm. One of the Debtor's co-workers at Covalent Capital was William Barrett Dean, III a/k/a William Berry Dean, III a/k/a Barrett Dean ("Dean"). Dean was of a similar age to the Debtor, was also a graduate of SMU, and was from a similar socio-economic background as that of the Debtor. The Debtor and Dean became fast friends.

20. Watters left Covalent Capital in 2007. By 2013, Dean was working at another private equity firm and Watters was pursuing investment opportunities. Around this time, Watters approached his old friend Dean with an opportunity for Dean to leave his then-current position in private equity to get involved in a company called Total Operating, LLC ("Total Operating").

**B.**     **The Debtor and Dean take over Total Operating, mismanage it to the point of insolvency, deceive Reticulum to provide Total Operating with life support, fail to repay Reticulum, are sued, intentionally violate a state court temporary restraining order, are sued again, and lose at arbitration.**

              **(i)**     **The Debtor and Dean take over Total Operating, a thriving family business.**

21.     In 2005, Harrold "Tex" Allen, his son, Jason Allen, and their friend, Dave Brickey, formed the company that would ultimately become Total Operating. The company's business model was to provide ancillary services for the oil and gas industry. Total Operating did everything from mowing rights of way, painting fences, and laying small runs of pipeline. The company was successful, and seven years later Total Operating was bringing in nearly $8 million per year in revenue and employed nearly 60 people.

22.     In 2012, Total Operating sold its right-of-way and mapping divisions and focused on pipeline construction, primarily pipelines in the range of fewer than 8,000 feet. Total Operating was in good financial condition, paid its bills on time, and enjoyed a good banking relationship with First State Bank.

23.     Also in 2012, Mr. Brickey met with an owner of an energy company in south Texas. During that meeting, Mr. Brickey met the Debtor, who was also meeting with that same business owner regarding some aspect of financial assistance or opportunity. When Mr. Brickey mentioned to Watters that he was a part-owner of a company looking to grow, Watters responded that companies looking to grow were exactly the type of companies in which he was interested.

24.     Thereafter, the Debtor and Dean met with the Allens and Mr. Brickey at Total Operating's office in Alvord, Texas. During that meeting, Watters and Dean represented to Total Operating's owners that, if they sold a portion of the company to Watters's and Dean's investment group, Total Operating would grow as big as the Allens and Mr. Brickey could imagine. Watters

and Dean told the Allens and Mr. Brickey that if they sold a portion of Total Operating to Watters's and Dean's group, they could stop worrying about personal guarantees and access to capital.

25.     As mentioned, Total Operating's focus at that time was small pipeline jobs, as Total Operating did not have the financial wherewithal to meet the capital commitment required by larger pipeline projects. The Allens and Mr. Brickey explained to Watters and Dean that what they needed to grow Total Operating's business was capital to support investment for the payroll and overhead required to frontload large-scale pipeline projects until invoices were paid on those projects. Watters and Dean informed the Allens and Mr. Brickey that they had deep financial resources and that they would have no problem providing Total Operating as much cash as it needed to support growth.

26.     Thereafter, the Allens and Mr. Brickey agreed to sell 60% of Total Operating to the investment group controlled by Watters and Dean. Total Operating's founders also agreed to give Watters and Dean the right to appoint three out of the five managers who would comprise the board of managers for the company, thereby giving Watters and Dean nearly full control of Total Operating. After taking control of Total Operating, Watters was named as one of its managers.

**(ii)     The Debtor mismanages Total Operating to the point of insolvency.**

27.     Upon Watters and Dean assuming their roles at Total Operating, they replaced Total Operating's credit facility with First State Bank in favor of a line of credit with Capital One and a $200,000 savings account, neither of which could be accessed by anyone but Watters or Dean. Watters and Dean established an equipment loan with Capital One and then went on a truck-buying binge, buying 28 trucks between March of 2013 and June of 2013 from a Houston-area car dealership owned by Dean's father-in-law. Not only did Total Operating not need all those vehicles, but Total Operating could not even afford to outfit all those vehicles for work in the field.

28.     Watters and Dean then proceeded to "factor" all invoices for projects that Total Operating was working on. Generally speaking, "factoring" is a payday loan for a construction company. It is not unusual for it to take months to get an invoice paid in the pipeline construction business. All the while, the construction company is having to carry significant expenses for project overhead. A factoring company provides a solution by offering short-term credit to construction companies waiting to be paid. The factoring company pays a percentage of the face amount of the invoice and then is assigned the account receivable. However, the cost of this credit is high. While Total Operating was factoring its invoices prior to the involvement of Watters and Dean, one of the goals of involving their investment group was to provide access to capital so that Total Operating would no longer need to rely on factoring its invoices.

29.     In any event, the ultimate result of allowing Watters and Dean to acquire a majority interest in Total Operating was to overburden Total Operating with debt and subject it to mismanagement by an incompetent investment group that had no experience in the oil and gas industry.

30.     By May of 2015, Watters and Dean had nearly driven Total Operating out of business. Total Operating's financials had tanked, and Watters and Dean were running out of people to convince to give them money.

**(iii)     Watters and Dean trick the Plaintiff into lending Total Operating $500,000.**

31.     During the summer of 2015, Watters and Dean were desperate for cash. Total Operating was struggling to pay its vendors and employees, and Total Operating's continued existence was questionable.

32.     At that time, Watters was friends with a man named Bill Durham, who acted as the financial advisor for an individual named Fred Brown. In fact, Mr. Brown was working with

Watters's father, Russell Watters, on an unrelated real estate deal in Missouri. Watters knew that Mr. Brown made hard money loans. Therefore, Watters reached out to Mr. Durham and Mr. Brown to sell Mr. Brown on giving Total Operating a $500,000 loan that would be payable within 90 days.

33.     To obscure why Total Operating needed the money, Watters and Dean explained to Mr. Durham and Mr. Brown that Total Operating had just begun work on a significant new pipeline project that they referred to as the Jetta job ("Jetta"). According to Watters and Dean, Total Operating wanted to stop factoring its invoices for this project, and so it needed a $500,000 bridge loan so that it had enough working capital to continue to work on the project while it waited to receive payment on its invoices.

34.     Specifically, to induce the loan, which would be extended by Plaintiff Reticulum, an entity owned by Mr. Durham, Watters and Dean made certain misrepresentations to Mr. Durham and Mr. Brown, including, but not limited to the following:

> (a)     The loan would be a short-term loan;
>
> (b)     Total Operating had recently won the Jetta project and needed the money to proceed to work on the job;
>
> (c)     The funds from Reticulum would be exclusively used for Jetta;
>
> (d)     The invoices for Jetta would provide quick cash flow to pay back the short-term loan;
>
> (e)     The first $500,000 that came back from Jetta would immediately go to pay off the Reticulum loan;
>
> (f)     Total Operating would not factor any more invoices in connection to Jetta;
>
> (g)     Total Operating was in the midst of obtaining a new commercial bank loan which was in progress of being funded;
>
> (h)     The new commercial bank loan would also be sufficient to pay back the loan to Reticulum if that loan was funded before the first $500,000 in receipts came back from Jetta;

---

(i)    The new bank loan would be funded in the time frame contained in the Agreement, and therefore the Reticulum loan was to provide for short-term funding;

(j)    Total Operating owned vehicles worth $2,480,313 and machinery and equipment worth $1,506,241 to secure the loan;

(k)    Total Operating's board approved the short-term loan;

(l)    The short-term loan to Reticulum would be a secured loan;

(m)    Total Operating had also raised $500,000 in equity;

(n)    Except for Capital One, Total Operating's other creditors had consented to Reticulum's loan taking priority over all other security interests.

35.    In addition to these oral representations, Watters and Dean prepared a PowerPoint presentation purporting to summarize Total Operating's financial condition as of the summer of 2015 and gave this presentation to Mr. Durham and Mr. Brown. A true and correct copy of this presentation is attached hereto as **Exhibit 1**. In addition to the presentation, Dean prepared a fixed asset schedule, which was also given to Mr. Durham and Mr. Brown, and which provided additional corroboration of the value of Total Operating's vehicles and equipment. A true and correct copy of this fixed asset schedule is attached hereto as **Exhibit 2**.

36.    These oral and written representations by Watters and Dean were false. To the contrary of these representations, and unknown to Reticulum, Total Operating was a sinking ship destined for insolvency. Indeed, on July 24, 2015, just three days before Total Operating entered into the agreement that would eventually result in this Bankruptcy Case, Dean sent an email to Watters stating that Total Operating had to hold over $100,000 of vendor checks so it could "keep [its] employees for another week." Worse, the Debtor's representations regarding the value of Total Operating's vehicles and equipment were grossly inflated and included vehicles and equipment that Total Operating did not even own.

37.     Nonetheless, the Debtor's deceptions were effective, and Mr. Durham and Mr. Brown agreed to the transaction. Mr. Durham volunteered the use of his entity, Reticulum, to be used to make the loan, with Mr. Brown supplying most of the money for the loan's principal.

### (iv)     The Sale & Buyback Agreement.

38.     The loan was ultimately structured as a purchase by Reticulum of Total Operating's profits realized from Jetta, with Total Operating having the option of "buying back" the receivable by October 30, 2015. If Total Operating failed to buy back the receivable, then the loan would convert to a promissory note. On July 27, 2015, Reticulum and Total Operating memorialized the transaction by entering into a contract styled "Sale and Buyback Agreement" (the "Sale Buyback Agreement").

39.     Importantly, while Reticulum was facially purchasing the profits from Jetta, the Sale Buyback Agreement only required Total Operating to turn over any amounts received from unfactored invoices. An earlier draft of the Sale Buyback Agreement did not contain the term "unfactored," but instead simply required the turning over of amounts received from any Jetta invoices.

40.     On behalf of the Debtor and himself, Dean suggested the revision to the agreement requiring the turning over of amounts only from unfactored invoices. Plaintiff was not surprised or alarmed by the requested revision because it knew that Total Operating had been factoring invoices for Jetta up to that point. Because the purpose of the loan was to allow Total Operating to stop factoring its invoices, and because Watters and Dean had represented that Total Operating would stop factoring the Jetta invoices, Reticulum believed that the use of the term "unfactored invoices" was simply to refer to any previous Jetta invoices that had been factored. In other words, Reticulum thought the revision was a mere precaution to prevent the Sale Buyback Agreement from interfering with prior factoring agreements Total Operating may have entered into.

---

**ORIGINAL COMPLAINT**

41. Total Operating failed to repay Reticulum by October 30, 2015, and the Sale Buyback Agreement therefore automatically converted to a promissory note, which in turn was secured by a Security Agreement (the "Security Agreement"), which was subsequently executed by the parties to be effective as of October 30, 2015.

**(v)      The State Court Lawsuit against Total Operating.**

42. From October 30, 2015 through the spring of 2016, Total Operating failed to repay the loan despite its constant promises that it would. Although the debt was outstanding, Total Operating maintained a good relationship with Reticulum during this time period by providing additional proof of the value of its assets. Specifically, Total Operating sent to Reticulum a copy of an appraisal of its equipment dated December 15, 2015. A true and correct copy of this appraisal is attached hereto as **Exhibit 3**. This appraisal stated that the value of Total Operating's equipment was $4,133,500. However, and again, this appraisal grossly overstated the value of Total Operating's equipment as the appraisal included leased vehicles. Nonetheless, the appraisal assured Reticulum that Total Operating had more than enough assets to cover the repayment of the loan, and so Reticulum delayed the exercise of any of its default remedies.

43. Yet throughout this time, unknown to Reticulum was that Total Operating was completely insolvent with no reasonable expectation of being able to continue its operations for much longer. To make matters worse, Total Operating's management was dysfunctional, and the relationship of Total Operating's founders with Watters and Dean was seemingly beyond repair.

44. On March 11, 2016, Tex Allen and Jason Allen sued Watters and Dean, alleging claims for breach of contract, breach of fiduciary duty, fraudulent inducement, violations of Texas Business and Commerce Code Section 27.01, and conspiracy.

45. On June 22, 2016, after learning that Watters and Dean were selling off seemingly all of Total Operating's assets that were covered by the Security Agreement without Reticulum's

permission, Reticulum filed a lawsuit styled *Reticulum Management, LLC v. Total Operating, LLC*, Cause No. DC-16-07521, in the 14th Judicial District of Dallas County, Texas. Soon after filing this lawsuit, Plaintiff sought and obtained a temporary restraining order preventing Total Operating from selling any additional assets covered by the Security Agreement.

46.     Watters and Dean then made the strategic decision to violate the temporary restraining order. Watters and Dean were particularly concerned that, if Total Operating did not pay its payroll taxes to the U.S. Internal Revenue Service, then as managers of the company, Watters and Dean would become personally liable for that debt. So Watters and Dean continued to illegally sell assets in violation and defiance of the state court's restraining order.

47.     On July 30, 2016, in advance of a hearing on Reticulum's application for a temporary injunction, Total Operating filed for bankruptcy relief in the Northern District of Texas, Dallas Division, pursuant to chapter 7 of the Bankruptcy Code. *See* Case No. 16-70245-hdh.

### (vi)     The State Court Lawsuit and Arbitration against Watters and Dean.

48.     On May 23, 2017, Reticulum filed a presuit petition in Texas state court pursuant to Texas Rule of Civil Procedure 202 against Watters and Dean individually, to investigate claims for, *inter alia*, fraud, fraud by non-disclosure, fraudulent inducement, and negligent misrepresentation relating to Watters's and Dean's actions in connection with the Sale Buyback Agreement and the Security Agreement. Watters subsequently filed a motion to stay the state court proceeding and compel arbitration pursuant to the arbitration agreement in the Sale Buyback Agreement.

49.     On August 15, 2017, the state court granted Watters's motion and stayed the state court proceeding to allow the parties to proceed to arbitration.

50.     On November 13, 2017, Reticulum filed its demand for arbitration against Watters and Dean with the American Arbitration Association ("AAA"), which commenced an arbitration

proceeding under AAA Case No. 01-17-0006-8709 (the "Arbitration"). An arbitration panel (the "Arbitration Panel") was subsequently appointed in accordance with the arbitration agreement in the Sale Buyback Agreement and in accordance with the AAA Commercial Arbitration Rules.

51.      The Arbitration's final hearing was conducted from October 22, 2018 through October 24, 2018.

### (vii)     The Arbitration Awards.

52.      On December 3, 2018, the Arbitration Panel issued an Interim Award (the "Interim Award"), jointly and severally against Watters and Dean in the amount of $500,000, plus attorneys' fees and costs. The Arbitration Panel concluded that Watters and Dean were liable for negligent misrepresentation.

53.      On January 9, 2019, Dean filed a voluntary petition under chapter 7 of title 11 of the Bankruptcy Code. Dean's bankruptcy case is currently pending in this District as Case No. 19-31232-sgj7.

54.      After Dean filed his bankruptcy case, the claims pending against Watters were severed to allow the Arbitration Panel to enter a final award against Watters.

55.      On March 12, 2019, the Arbitration Panel issued its Final Award (the "Final Award") against Watters in the total amount of $993,447.75, which included $500,000 in damages, $434,966.36 in attorneys' fees and expenses, $8,085.00 in administrative fees of the AAA, $15,660.00 in arbitrator fees, and $34,736.39 in pre-award interest. The Arbitration Panel further awarded Reticulum post-award interest on the total amount, "compounded annually at the annual rate of 5.25% beginning on the date that [the] award [was] signed until [the] award is paid in full."

56.      Additionally, the Final Award clarified that, "[w]hile the bankruptcy stay prevent[ed] the Panel from entering a final award against Barrett Dean at [that] time, the entering

of [the] final award solely against Respondent Watters [was] not intended to vitiate the Panel's previous finding of joint and several liability."

57.     The debt owed by Watters to Reticulum, as evidenced by the Final Award (hereinafter, the "Reticulum Debt") prompted Watters to file this Bankruptcy Case. As the Reticulum Debt is an obligation to repay a loan obtained by the misrepresentations described above, the Reticulum Debt should not be discharged.

## VI.     CAUSES OF ACTION

### Count 1:  Objection to Dischargeability Under 11 U.S.C. § 523(a)(2)(A)

58.     Plaintiff incorporates the preceding paragraphs as if set forth fully herein.

59.     Under section 523(a)(2)(A) of the Bankruptcy Code:

A discharge under section 727 [of the Bankruptcy Code] does not discharge an individual of any debt . . . for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by . . . false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition[.]

11 U.S.C. § 523(a)(2)(A).

60.     As discussed above, to induce Reticulum into entering into the Sale Buyback Agreement and making the $500,000 loan to Total Operating (the "Total Operating Loan"), the Debtor made certain misrepresentations to Reticulum, which include, but are not limited to, the following:

(a)     The loan would be a short-term loan;

(b)     Total Operating had recently won the Jetta job and needed the money to proceed to work on the job;

(c)     The funds from Reticulum would be exclusively used for the Jetta job;

(d)     The Jetta job would provide quick cash flow to pay back the short-term loan;

(e)      The first $500,000 that came back from the Jetta project would immediately go to pay off the Reticulum loan;

(f)      Total Operating would not factor any more invoices in connection to the Jetta job;

(g)      Total Operating was in the midst of obtaining a new commercial bank loan which was in progress of being funded;

(h)      The new commercial bank loan would also be sufficient to pay back the loan to Reticulum if that loan was funded before the first $500,000 in receipts came back from the Jetta job;

(i)      The new bank loan would be funded in the time frame contained in the Agreement, and therefore the Reticulum loan was to provide for short term funding;

(j)      Total Operating owned vehicles worth $2,480,313 and machinery and equipment worth $1,506,241 to secure the loan;

(k)      Total Operating's board approved the short-term loan;

(l)      The short-term loan to Reticulum would be a secured loan;

(m)      Total Operating had also raised $500,000 in equity;

(n)      Except for Capital One, Total Operating's other creditors had consented to Reticulum's loan taking priority over all other security interests.

61.      The false statements described above, made by the Debtor to Reticulum, include statements that: (1) were knowing and fraudulent falsehoods; (2) describing past or current facts; and (3) were justifiably relied upon by Reticulum. In addition, the Debtor failed to disclose material facts to Reticulum in connection with the Total Operating Loan, including but not limited to the Debtor's failure to disclose the absence of any factoring receivables. Further, as evidenced by the Debtor's actions, the Debtor never intended to repay the Total Operating Loan. Thus, the Debtor acted with false pretenses and made false representations to obtain the Total Operating Loan, which forms the basis of the Reticulum Debt.

62.      Additionally, with respect to the false representations described above: (1) the Debtor made the representations; (2) the Debtor knew the representations were false at the time

they were made; (3) the Debtor made the representations with the intention and purpose to deceive Reticulum; (4) Reticulum justifiably relied on such representations; and (5) Reticulum sustained losses, in the form of the Reticulum Debt, as a proximate result of the representations. Thus, the Debtor committed actual fraud in connection with obtaining the Total Operating Loan, which forms the basis of the Reticulum Debt.

63.     The Court should therefore except the Reticulum Debt from discharge under section 523(a)(2)(A) of the Bankruptcy Code.

### Count 2:  Objection to Dischargeability Under 11 U.S.C. § 523(a)(2)(B)

64.     Plaintiff incorporates the preceding paragraphs as if set forth fully herein.

65.     Under section 523(a)(2)(B) of the Bankruptcy Code:

> A discharge under section 727 [of the Bankruptcy Code] does not discharge an individual of any debt . . . for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by . . . use of a statement in writing[:] (i) that is materially false; (ii) respecting the debtor's or an insider's financial condition; (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and (iv) that the debtor caused to be made or published with intent to deceive[.]

11 U.S.C. § 523(a)(2)(B).

66.     Total Operating was an insider of the Debtor. *See* 11 U.S.C. § 101(31)(A)(iv).

67.     Specifically, the Debtor helped prepare a PowerPoint presentation titled "Equity/Debt Investment Discussion Round 2 – July 2015," which was provided to Reticulum while Reticulum was considering making the loan. Contained in that document were the following misrepresentations: Total Operating had assets including $2.48 million worth of vehicles and $1.506 million worth of machinery and equipment. Further, the Debtor prepared a fixed asset schedule, which was provided to Reticulum, that misrepresented the value of Total Operating's vehicles and equipment. The Debtor is also responsible for sending to Reticulum a copy of an

appraisal of Total Operating's equipment, dated December 15, 2015, that grossly overstated the value of Total Operating's equipment.

68.     The false statements in writing described above, made or published by the Debtor to Reticulum, were: (1) materially false; (2) respecting Total Operating's financial condition, (3) reasonably relied upon by Reticulum in connection with the Total Operating Loan, which forms the basis of the Reticulum Debt; and (4) made or published by the Debtor with the intent to deceive Reticulum.

69.     The Court should therefore except the Reticulum Debt from discharge under section 523(a)(2)(B) of the Bankruptcy Code.

### Count 3:  Objection to Dischargeability Under 11 U.S.C. § 523(a)(6)

70.     Plaintiff incorporates the preceding paragraphs as if set forth fully herein.

71.     Under section 523(a)(6) of the Bankruptcy Code, a "discharge under section 727 [of the Bankruptcy Code] does not discharge an individual of any debt . . . for willful and malicious injury by the debtor to another entity or to the property of another entity[.]" *See* 11 U.S.C. § 523(a)(6).

72.     The Debtor acted deliberately and intentionally to injure Reticulum when he, among other actions, caused the provision regarding unfactored receivables to be added to the Agreement (while he intended for no unfactored receivables to exist), failed to turn over to Reticulum certain unfactored receivables that did exist, and when he sold and took steps toward selling Reticulum's collateral under the Security Agreement to third parties. The Debtor knew that such deliberate and intentional actions would harm Reticulum at the time he took such actions.

73.     The Court should therefore except the Reticulum Debt from discharge under section 523(a)(6) of the Bankruptcy Code.

---

**ORIGINAL COMPLAINT**                                                                 **Page 17 of 18**

*Count 4: Attorneys' Fees and Costs*

74.     Plaintiff incorporates the preceding paragraphs as if set forth fully herein.

75.     To the extent Reticulum is entitled to attorneys' fees and costs in connection with recovering the Reticulum Debt, or pursuant to the Interim Award or applicable law, Reticulum requests recovery of its attorneys' fees and costs incurred in connection with bringing this Adversary Proceeding.

**VII.     PRAYER**

Plaintiff respectfully requests that the Court: (i) enter judgment declaring that the Reticulum Debt is excepted from discharge pursuant to 11 U.S.C. § 523(a)(2)(A), (a)(2)(B), and (a)(6); (ii) enter judgment against the Debtor for attorneys' fees and costs incurred in connection with the prosecution of this Adversary Proceeding; and (iii) grant any other such relief that Reticulum may show itself to be justly entitled in law or in equity.

**DATED: July 6, 2020.**

Respectfully submitted,

By:*/s/Julie Pettit*
Julie Pettit
State Bar No. 24065971
**THE PETTIT LAW FIRM**
2101 Cedar Springs, Suite 1540
Dallas, Texas 75201
Tel. (214) 329-0151
Fax. (214) 329-4076
jpettit@pettitfirm.com
**ATTORNEYS FOR RETICULUM MANAGEMENT, LLC**